LYLE *v.* STATE.

(In Banc.　June 8, 1942.)

[8 So. (2d) 459.　No. 34810.]

C. B. Cameron and M. V. B. Miller, both of Meridian, for appellant.

**Greek L. Rice**, Attorney General, by **R. O. Arrington**, Assistant Attorney General, for appellee.

Argued orally by **C. B. Cameron** and **M. V. B. Miller**, for appellant, and by **R. O. Arrington**, for appellee.

**Anderson, J.**, delivered the opinion of the court.

Appellant, T. C. Lyle, and John F. Moore, were jointly indicted for the crime of arson, as defined by chapter 272, Laws 1932. The arson was the burning of a residence in the village of Lauderdale, belonging to the appellant, which at the time was occupied by human beings, the Russell family. Moore plead guilty to the charge, and was sentenced to the penitentiary for a term of five years. On the trial of appellant Moore "turned state's evidence;" and on his testimony alone appellant was convicted and sentenced to the penitentiary for the term of five years. From that judgment he prosecutes this appeal.

At the time of the burning of the residence it was occupied by the Russell family—that was unquestioned. The residence was insured against fire in the sum of $1,000, payable to appellant. Moore, the alleged accomplice, testified that appellant employed him to burn the

house in order to collect the insurance, and agreed to pay him $100 out of the insurance money for his services.

We are of opinion that appellant was entitled to a directed verdict of not guilty, which was denied him by the trial court, and we reach that conclusion upon the following considerations: The residence was burned in February, 1941. We here consider first Moore's version. He testified that in July, 1940, appellant discussed with him the advisability of remodeling and repairing the residence, with the thought of employing him to do the work; and that several times thereafter, during 1940, that subject was discussed between them, including the advisability of burning the residence with a view of getting the insurance; that finally, on February 15, 1941, it was agreed between them that he, Moore, should burn the residence that day—which he did, setting it afire about 7:30 that afternoon; that he expressed the fear to appellant that on account of the absence of their father at the time there would be danger to the Russell children, the only occupants of the house. To which appellant replied that he had the matter all arranged with Russell, so that no such result could follow; that Leo Miller, a nephew of his, had a car from which he siphoned three gallons of gasoline and poured it into the residence, setting it afire with a match, which resulted in the destruction of the building; that on one occasion before the burning he and appellant discussed the subject in the presence of Leo Miller (when the case was tried Miller had migrated to Oklahoma, and was not present at the trial). On cross-examination Moore admitted that at the time he burned the residence he was drinking, and was perhaps drunk; that he did not believe he would have done it if he had been sober. He admitted, also, that he had been convicted of the crime of receiving stolen goods. Numerous witnesses who had known Moore for a long time testified that his reputation for truth and veracity was bad, and that they would not believe him on oath. There was no evidence whatever to the contrary.

Appellant testified that he had no connection of any kind with the burning; that there existed no motive whatever that could have prompted him to have the residence burned. Without any substantial conflict in the evidence the following facts were shown: Appellant was fifty-seven years of age, and a retired merchant. He and his wife lived alone. He owned a residence in Lauderdale, had a cow, raised chickens, had an acre garden from which he sold vegetables. He owned two negro cabins, which were rented; and his wife owned a brick store building. His only children were two sons, prosperous business men, one a purchaser, in New York City, for Sears, Roebuck & Company, and the other a business man in Memphis, Tennessee. And he had two sisters, Mrs. Sullivan and Mrs. Dunigan, of Laurel. Appellant had been in bad health for something like ten years, and on that account had retired from the mercantile business. The sons contributed toward the support of their mother and father, and had been doing so for some time, not less than $100 per month; and during the year 1940 they spent $611 on repairing and remodeling their home, and paid off a mortgage thereon of $540.

The residence burned was a 12-room house, constructed before the Civil War by the father of appellant. It had large rooms and halls, and spacious galleries. It was built of heart pine timbers. In the yard there was something like a dozen magnificent oak trees, which were badly damaged by the fire. Appellant's father died in 1926. Under his will this old home went to his two daughters in Laurel, Mrs. Sullivan and Mrs. Dunigan. They owned it until November, 1940, when they conveyed it to appellant in consideration of his paying the accrued unpaid taxes thereon. It had been insured against fire for $1,500, evidenced by two policies, one for $1,000 and one for $500. Before the conveyance to appellant his sisters had failed to renew the $500 policy, leaving the $1,000 policy in force, which was changed so as to make appellant the beneficiary

in case of loss. That policy was the one in force when the fire occurred. Several witnesses testified as to the value of the residence alone, among them a sawmill operator, a carpenter, the insurance agent through whom the property was insured, the insurance adjustor who passed on the loss, and others in the community, who knew the property and its value. None of them put the value of the house alone at less than $1,200, except Moore, the alleged accomplice, who admitted that the timbers in the house, if torn down, would be worth something like $500. During the months of July, August, September and October, 1940, when Moore testified that he and appellant were discussing the remodeling, or the burning, of the house, appellant did not own it—it still belonged to his sisters, who as stated conveyed it to him during November of that year. Eight witnesses in the community, who knew appellant well, testified that his reputation for integrity and truth and veracity was good, and they would believe him on oath. There was no testimony whatever to the contrary. There was an entire absence of any evidence that appellant would benefit by the fire; on the contrary, it showed without any substantial conflict, that there would be a loss.

On account of his drunken condition Moore either did not know what he was doing, or hoped that he might get the job of rebuilding.

In Truckers Exchange Bank v. Conroy, 190 Miss. 242, 250, 199 So. 301, and Jakup v. Lewis Grocer Co., 190 Miss. 444, 452, 200 So. 597, we laid down the rule that where, upon the entire record, it is manifest that sound and reasonable men engaged in a search for truth, uninfluenced by bias or other improper motives or considerations, could not safely accept and act upon the evidence in support of an issue as true, a jury will not be permitted to consider it.

The case of Creed v. State, 179 Miss. 700, 176 So. 596, 597, states the controlling principle in this language:

"The rule is well settled that, while a conviction may be sustained on the uncorroborated testimony of an accomplice, it is equally well settled that such a conviction should not be upheld where such testimony is improbable, self-contradictory, and unreasonable on its face, and especially where it is impeached by unimpeached witnesses."

The last clause of that quotation fits the state's case exactly. Moore's testimony is improbable, is self-contradictory, is unreasonable, and is impeached by unimpeached witnesses.

Reversed and judgment for appellant.